# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

EMANI LOVE, et al.                          Case No. 15-cv-11834

                    Plaintiffs,             Hon. Nancy G. Edmunds

        v.                                  Mag. Elizabeth A. Stafford

RUTH JOHNSON,

                    Defendant.

# PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

FACTUAL BACKGROUND ................................................................... 1

ARGUMENT ........................................................................................ 4

I.       Plaintiffs Have Adequately Pled a Violation of Their Constitutional Right to Privacy. .................................................................... 5

II.      Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their First Amendment Rights. ........................................... 11

III.     Plaintiffs Have Adequately Pled That the Driver's License Policy Violates the Equal Protection Clause of the Fourteenth Amendment. 16

IV.      Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their Right to Interstate Travel. .......................................... 20

V.       Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their Due Process Right to Avoid Forced Medical Treatment. ......... 23

VI.      Plaintiffs Have Adequately Pled That Defendant's Policy Fails Even Rational Basis Review. ................................................... 25

CONCLUSION ................................................................... 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Attorney Gen. of New York v. Soto-Lopez*,
    476 U.S. 898 (1986)...........................................................................21

*Axson—Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ........................................................13

*Back v. Hastings On Hudson Union Free Sch. Dist.*,
    365 F.3d 107 (2d Cir. 2004) .............................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................5

*Bloch v. Ribar*,
    156 F.3d 673 (6th Cir. 1998) ....................................................passim

*C.N. v. Wolf*,
    410 F. Supp. 2d 894 (C.D. Cal. 2005) ..............................................11

*Califano v. Westcott*,
    443 U.S. 76 (1979)............................................................................18

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).....................................................................16, 25

*Crump v. Curtis*,
    50 F. App'x 217 (6th Cir. 2002) .........................................................9

*Davis v. Prison Health Servs.*,
    679 F.3d 433 (6th Cir. 2012) ............................................................25

*Dean v. United States*,
    436 F. Supp. 2d 485 (E.D.N.Y 2006) ...............................................27

*DeBoer v. Snyder*,
    772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell v.
    Hodges*, 135 S.Ct. 2584 (2015) .......................................................21

*Derungs v. Wal-Mart Stores, Inc.*,
374 F.3d 428 (6th Cir. 2004) ..............................................................................19

*Doe ex rel. Doe v. Yuntis*,
No. 001060A, 2000 WL 33162199 (Mass. Super. Ct. Oct. 11,
2000), *aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-
638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000) ................................14

*Doe v. Bell*,
754 N.Y.S.2d 846 (Sup. Ct. 2003)......................................................................14

*Forbush v. Wallace*,
341 F. Supp. 217 (M.D. Ala. 1971), *aff'd,* 405 U.S. 970 (1972) ......................27

*G & V Lounge v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ..............................................................................10

*Glen v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ..........................................................................19

*Hayes v. Bd. of Regents of Kentucky State University*,
495 F.2d 1326 (6th Cir. 1974) ......................................................................21, 22

*Hooper v. Bernadillo Cty. Assessor*,
472 U.S. 612 (1985)............................................................................................30

*J.E.B. v. Ala. ex rel. T.B.*,
511 U.S. 127 (1994)............................................................................................18

*K.L. v. State of Alaska, Dep't of Admin., Div. of Motor Vehicles*,
No. 3AN-11-05431 CI, 2012 WL 2685183 (Alaska Super. Ct. Mar.
12, 2012) ......................................................................................................passim

*Kallstrom v. City of Columbus*,
136 F.3d 1055 (6th Cir. 1998) ....................................................................passim

*Lebron v. Sec'y of the Fla. Dep't of Children & Families*,
772 F.3d 1352 (11th Cir. 2014) ..........................................................................24

*Lee v. Willey¸*
No. 10-12625, 2012 WL 4009629 (E.D. Mich. Aug. 10, 2012) ..........................9

*Littlejohn v. Rose*,
    768 F.2d 765 (6th Cir. 1985) ........................................................10, 24

*Metropolitan Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985).........................................................................27

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981).........................................................................28

*Nguon v. Wolf*,
    517 F. Supp. 2d 1177 (C.D. Cal. 2007) ............................................11

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)...........................................................................5

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015)........................................................................6

*Paige v. Coyner*,
    614 F.3d 273 (6th Cir. 2010) .............................................................5

*Perry v. Sindermann*,
    408 U.S. 593 (1972).........................................................................10

*Planned Parenthood v. Daugaard*,
    799 F. Supp. 2d 1048 (D.S.D. 2011) ................................................13

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009).........................................................................15

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) ..............................................................8

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988).............................................................12, 13, 16

*Romer v. Evans*,
    517 U.S. 620 (1996).....................................................................25, 27

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006)........................................................................12, 14

iv

*Saenz v. Roe,*
    526 U.S. 489 (1999)...............................................................................20, 21, 22

*Schroer v. Billington,*
    577 F. Supp. 2d 293 (D.D.C. 2008)...................................................................19

*Sell v. United States,*
    539 U.S. 166 (2003)...........................................................................................23

*Somers v. Superior Court of San Francisco City and Cnty.,*
    172 Cal. App. 4th 1407 (2009)……………………………………………...17

*Sterling v. Borough of Minersville,*
    232 F.3d 190 (3d Cir. 2000)……………………………………………....10

*U.S. Citizens Ass'n v. Sebelius,*
    705 F.3d 588 (6th Cir. 2013) ............................................................................24

*United States DOJ v. Reporters Comm. for Freedom of Press,*
    489 U.S. 749 (1989).........................................................................................11

*United States v. Virginia,*
    518 U.S. 515 (1996)....................................................................................18, 20

*W. Va. Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)....................................................................................11, 13

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.,*
    135 S. Ct. 2239 (2015)................................................................................15, 16

*Whalen v. Roe,*
    429 U.S. 589 (1977)......................................................................................5, 23

*Wilson v. Phoenix House,*
    978 N.Y.S.2d 748 (Sup. Ct. 2013).......................................................................9

*Wooley v. Maynard,*
    430 U.S. 705 (1977)................................................................................12, 13, 16

## STATUTES

Mich. Comp. Laws § 168.495.................................................................................12

Mich. Comp. Laws § 168.497c…………………………………………………12

Mich. Comp. Laws § 168.509r………………………………………………12

Mich. Comp. Laws § 211.7u…………………………………………...12

Mich. Comp. Laws § 257.311………………………………………………12

Mich. Comp. Laws § 257.324 (1)(a) & (2)........................................29, 30

Mich. Comp. Laws § 333.2831(c) ............................................................28

Mich. Comp. Laws § 427.304………………………………………………12

Mich. Comp. Laws § 445.486………………………………………………12

**OTHER AUTHORITIES**

28 C.F.R. § 115.42(c)................................................................30

Alaska Constitution.................................................................65

First Amendment..............................................................passim

Fourth Amendment .................................................................24

Fourteenth Amendment ...........................................16, 20, 22

Applying for a Licence or ID? Applicant Checklist, Ruth Johnson,
  Secretary of State, *available at*
  http://www.michigan.gov/sos/0,4670,7-127-
  1627_8669_9040_9043-312849--,00.html.................................3, 28

Bill of Rights............................................................................11

Rule 12(b)(6)...............................................................................4

## CONCISE STATEMENT OF THE ISSUES PRESENTED

1. Whether Plaintiffs have adequately pled that Defendant's policy requiring an amended birth certificate to correct the sex designation on their Michigan driver's license or state identification card ("Policy") violates Plaintiffs' constitutionally protected right to privacy in that the Policy forces Plaintiffs to reveal the sex they were assigned at birth and their transgender status to complete strangers causing substantial risk of harm and causing disclosure of intimate personal information, stigma, and scrutiny regarding their bodies?

2. Whether Plaintiffs have adequately pled that Defendant's Policy violates the Plaintiffs' First Amendment rights in that the Policy compels Plaintiffs to communicate private information regarding their birth-assigned sex and transgender status to complete strangers and to disseminate Defendant's opinion that they are one sex, when they are the other?

3. Whether Plaintiffs have adequately pled that Defendant's Policy violates the Equal Protection Clause: (a) by making it possible for persons born in some states to change the sex designation on their license without having gender confirmation surgery or obtaining a court order, while making it impossible or unduly burdensome for Plaintiffs to change the sex designation on their license because they were born in states that will not change the sex on a birth certificate or require surgery or a court order to do so; and (b) by making it possible for non-transgender persons to correct identifying characteristics on their license without producing evidence of the change while transgender individuals are required to produce an amended birth certificate?

4. Whether Plaintiffs have adequately pled that Defendant's Policy violates the right to interstate travel of Plaintiffs Tina Seitz, Codie Stone, E.B., and K.S. by making it impossible for them to correct the sex designation on their license or requiring them to secure a court order to do so because they were born outside of Michigan, when persons born in Michigan are able to correct the sex designation on their license by amending their birth certificate and without obtaining a court order?

5. Whether Plaintiffs have adequately pled that Defendant's Policy violates the Due Process Clause by forcing Plaintiffs Emani Love and A.M. to undergo surgery in order to correct the sex designation on their license?

## FACTUAL BACKGROUND

**The Plaintiffs**

Plaintiffs are six Michiganders who are unable to correct the sex designation on their driver's license or state identification cards ("State IDs", "IDs" or "license") to accurately match their sex because of Defendant's policy.  Compl. ¶¶ 5, 52, 60, 70, 77, 85, 92. Defendant's policy for changing the sex on State IDs ("Driver's License Policy" or "Policy") requires transgender individuals to amend the sex on their birth certificates in order to correct the sex on their IDs. *Id.* ¶ 3.

The result is a policy that varies by Michiganders' state of birth. *Id.* ¶¶ 5-6. For those such as Tina Seitz, Codie Stone, and E.B., who were born in a state that does not allow changes to the sex designation on birth certificates, it is *impossible* to ever correct the sex on their licenses.  *Id.* ¶¶ 5a, 67-69, 75-76, 83-84. Persons such as K.S., whose birth state requires a court order to amend the sex on a birth certificate, face a significant burden on their ability to correct the sex on their license that persons born in Michigan and other states do not face.  *Id.* ¶¶ 5b, 91. Those born in Michigan face another significant burden on correcting the sex on their license: the requirement that they undergo gender confirmation surgery (otherwise known as "sex reassignment surgery") to amend the sex on their birth certificate, even though Emani Love and A.M. have no current medical need, do not have insurance coverage and/or do not have the money to pay out-of-pocket for such surgery. *Id.* ¶¶ 5c, 51, 56. In contrast, Michiganders born in states where

1

surgery is not required to amend the sex on their birth certificate are able to secure

an accurate Michigan license and without being forced to undergo surgery they

may not want or need. *Id.* ¶ 7.

Plaintiffs were all assigned a sex at birth that does not match their gender

identity—their innate understanding of themselves as male or female.  *Id.* ¶¶ 23,

47, 54, 62, 72, 79, 87. All Plaintiffs have transitioned to living full time consistent

with their gender identity.  *Id.* ¶¶ 48-49, 55, 57, 58, 63-65, 73-74, 80-81, 88-89.

All have State IDs with photos and names that reflect their sex, while the sex

marker on the ID is inaccurate and conflicts with their appearance, identity and

lived sex.  *Id.* ¶¶ 52, 60, 70, 77, 85, 92.

**Sex and Gender**

In response to Plaintiffs' argument that the sex markers on their IDs are

inaccurate, Defendant argues in her brief that "gender" and "sex" are different and

that "sex" on a Michigan license refers only to "[a] person's biological status as

either male or female," which in turn is "based primarily on physical attributes

such as chromosomes, hormone prevalence, and external and internal anatomy."

Def. Br. 1-2 (citation and quotation omitted).  Defendant's proposed definition of

"sex," however, directly contravenes the scientific and medical consensus that

multiple factors determine a person's sex in addition to physical components—the

most important of which is gender identity—or a person's core identification with

a particular sex. Compl. ¶ 26. Defendant's own practice, moreover, is to use the term "gender" in the context of identity documents, not to draw an illusory distinction between "gender" and "sex." *Id.* ¶¶ 3 & n.2, 43c.

In any event, even using Defendant's proposed definition of sex, Defendant's Policy does not actually result in State IDs accurately reflecting a person's sex. Two individuals with the same physical attributes will have different sex markers on their license if one of them was born in a state allowing birth certificate amendments and one was not. *See id.* ¶¶ 5-6. Defendant would like to defend a policy that reflects a person's "physical attributes," but that is not the Policy she is enforcing.[1]

**Defendant's Policy and Its Harm to Plaintiffs**

Forcing Plaintiffs and other transgender individuals to carry identification documents that identify them by the wrong sex harms them in numerous ways. It undermines their ability to function in their lived sex, discloses their private

---

[1] Additionally, Defendant's Policy only applies to persons who are seeking to renew or change an existing license. Compl. ¶¶ 2, 6; *see also* Def. Br. Ex. A. In contrast, there is no amended birth certificate required for a transgender person to obtain their first Michigan license listing the correct sex, since a passport may be presented for identification purposes and the sex listed on a passport may be corrected without having surgery or obtaining a court order. Compl. ¶¶ 6, 45a; *see also* Applying for a License or ID? Applicant Checklist, Ruth Johnson, Secretary of State, *available at* http://www.michigan.gov/sos/0,4670,7-127-1627_8669_9040_9043-312849--,00.html. Consequently, a transgender man who already had "M" on his passport when he applied for his first ID in Michigan could have the same "physical attributes" as a transgender man whose existing Michigan driver's license incorrectly designates him as female, but under Defendant's Policy they would have different sex markers on their Michigan IDs.

3

information, places them at risk of discrimination, harassment and injury, interferes with their medical treatment, and causes them psychological injury by labeling them by the wrong sex. Compl. ¶¶ 35-37, 93-104. For example, in a national study of transgender people, 3% of respondents reported being physically attacked or assaulted when they showed an ID document that failed to match their identity and expression. *Id*. ¶ 94. Some Plaintiffs have had hostile and embarrassing experiences when having to produce a license with the wrong sex on it. *Id.* ¶¶ 99-103. Others have gone to great lengths to avoid harassment, embarrassment, or discrimination. *Id.* ¶¶ 98-100, 103. All fear the adverse reaction or discrimination they might experience after producing a license with the wrong sex on it. *Id.* ¶¶ 97, 99-102.

Defendant's Policy is more restrictive than the policy previously in place in Michigan, which prior to 2003 did not require an amended birth certificate or gender confirmation surgery to correct the gender on a license. Compl. ¶ 42. It is also more restrictive than policies established by the federal government and numerous states that are in line with current scientific knowledge and recommendations of the major medical associations. *Id.* ¶ 45.

## ARGUMENT

When deciding a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff and must accept

all the factual allegations contained in the complaint as true." *Paige v. Coyner*, 614

F.3d 273, 277 (6th Cir. 2010). To survive a motion to dismiss, a "complaint need

contain only 'enough facts to state a claim to relief that is plausible on its face.'"

*Id.* (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

Plaintiffs' complaint adequately pleads violations of their rights to

informational privacy, free speech, equal protection, the right to travel, and

autonomy in medical decision-making.

## I.   Plaintiffs Have Adequately Pled a Violation of Their Constitutional Right to Privacy.

There is a "constitutionally protected 'zone of privacy'" that includes an

"individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*,

429 U.S. 589, 598-99 (1977); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S.

425, 457, 465 (1977) (recognizing "constitutionally protected privacy rights in

matters of personal life"). The Sixth Circuit has held that the Constitution protects

information maintained as private to preserve a person's "personal security and

bodily integrity," *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir.

1998), and information that is highly intimate, such as details about "private sexual

matters," *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998). Like the plaintiffs in

*Kallstrom* and *Bloch*, Plaintiffs' privacy interests in this case are constitutionally protected.[2]

Defendant's Policy requires Plaintiffs to disclose the sex they were assigned at birth rather than their lived sex every time they show their ID. Because the Policy requires Plaintiffs to carry an ID with a sex that conflicts with their lived sex, Defendant forces them to reveal their transgender status to complete strangers. *See K.L. v. State of Alaska, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431 CI, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012) (When a transgender woman "furnishes a driver's license bearing a male sex designation, the discrepancy between the license and their physical appearance can lead to the forced disclosure of the person's transgender[] status.").

In *Kallstrom*, the Sixth Circuit held that disclosure of police officers' home addresses to counsel for defendants they had testified against put the officers and their families at serious personal risk, thereby "ris[ing] to constitutional dimensions." 136 F.3d at 1063. Similarly, disclosing Plaintiffs' transgender status on Plaintiffs' IDs places them at serious risk of physical harm, endangering their

---

[2] Plaintiffs are not asserting a constitutional "right to change the sex designation on a driver's license," Def. Br. 4, but rather the violation of an established right to informational privacy regarding highly intimate personal facts. As a result, Defendant's arguments against expanding substantive due process, Def. Br. 3-4, 9-10, are inapposite. *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) ("If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied.").

personal security and bodily integrity and thereby rising to constitutional
dimensions. Compl. ¶¶ 94-97.

Defendant seeks to distinguish *Kallstrom* by claiming that the risks alleged
by Plaintiffs involve "hypothetical" risks to "transgender individuals in general."
Def. Br. 7. However, both Plaintiffs and the officers in *Kallstrom* face "substantial
risk of serious bodily harm, possibly even death, from a perceived likely threat."
136 F.3d at 1064. The police officers faced a risk from disclosure of information to
a discrete group of gang members, 136 F.3d at 1059, whereas Plaintiffs face a
known risk from disclosure of their transgender status to all who see their licenses.
Compl. ¶¶ 94-97. If anything, Plaintiffs' inability to identify a specific group of
persons who represent a security risk for them enhances, rather than reduces, the
privacy violation, since Plaintiffs are unable to know who among all the people
who see their license may try to harm them.

In addition, forcing Plaintiffs to reveal their transgender status violates their
constitutional privacy interests by revealing highly sensitive information of a
sexual or intimate nature analogous to the information about a rape victim revealed
in *Bloch*. In finding that such disclosure violated the victim's constitutional rights,
the Sixth Circuit relied on the "historic social stigma . . . attached to victims of
sexual violence" and the fact that revealing information about a rape "subject[s] a
victim to criticism and scrutiny concerning her sexuality and personal choices

7

regarding sex." *Bloch*, 156 F.3d at 685. A person's "sexuality and choices about

sex . . . are interests of an intimate nature which define significant portions of our

personhood," so that "[p]ublically revealing information regarding these interests

exposes an aspect of our lives that we regard as highly personal and private." *Id.*

Similarly, Plaintiffs face historic social stigma and their perceived "choices"

regarding sex subject them to criticism and scrutiny regarding their bodies.

Transgender people are often questioned about their transition and their anatomy

after their status as transgender is revealed. Compl. ¶ 97. Further, transgender

persons' decisions regarding their gender transition as well as the details associated

with that transition are deeply personal and of a sexual nature, placing it at the core

of informational privacy under *Bloch*. Compl. ¶ 30. In *Powell v. Schriver*, 175 F.3d

107, 111-12 (2d Cir. 1999), the Second Circuit held that "individuals who are

transsexuals are among those who possess a constitutional right to maintain

medical confidentiality," even in the prison context. It reached that conclusion

because "transsexualism is the unusual condition that is likely to provoke both an

intense desire to preserve one's medical confidentiality, as well as hostility and

intolerance from others" and "[t]he excruciatingly private and intimate nature of

transsexualism, for persons who wish to preserve privacy in the matter, is really

beyond debate." *Id.* (internal quotation marks and citations omitted); *see also K.L.*,

8

2012 WL 2685183, at *6 ("The Court agrees that one's transgender[] status is private, sensitive personal information" and "is entitled to protection.").

Defendant argues that Plaintiffs' claim is governed by the decision in *Lee v. Willey*¸ No. 10-12625, 2012 WL 4009629 (E.D. Mich. Aug. 10, 2012), in which the court rejected a privacy claim based on disclosure of sexual orientation because plaintiff "has not cited any case law nor has this Magistrate Judge found any case law holding that disclosure of Plaintiff's sexual orientation rises to the level of a breach of a right recognized as 'fundamental' under the Constitution." *Id.* at *10. *Lee* does not govern here for at least three reasons.  First, *Lee* involved a prison setting and it is well established that a prisoner's "privacy rights are less than those enjoyed by non-prisoners."  *Crump v. Curtis*, 50 F. App'x 217, 218 (6th Cir. 2002). Second, sexual orientation is not the same as gender identity, and the stigma and risks faced by transgender people are greater than the stigma and risk of violence faced by lesbians and gay men.[3] Third, case law does indeed hold that compelled disclosure of a person's transgender status violates their right to informational privacy. *See, e.g.*, *Powell*, 175 F.3d at 111-12.  Moreover, notwithstanding *Lee*,

---

[3] Compl. ¶ 95 & n.15 (citing report documenting higher incidence of violence experienced by transgender persons as compared to lesbian, gay, bisexual, queer, and HIV-impacted persons); *cf. Wilson v. Phoenix House*, 978 N.Y.S.2d 748, 754-55 (Sup. Ct. 2013) ("The legal and political community has made great strides in the last decade toward assuring legal equality for lesbian, gay and bisexual persons. . . . However, with regard to transgender[ ] and other gender nonconforming people, there has been far less progress in addressing their legal rights.").

such case law also exists in the context of sexual orientation. *See Sterling v. Borough of Minersville*, 232 F.3d 190 (3d Cir. 2000).

This Court should also reject Defendant's argument that Plaintiffs' privacy interests are not entitled to constitutional protections because Plaintiffs "voluntarily" obtained their licenses. Def. Br. 7. A person may not be forced to choose between a valuable government benefit – either a job or a license – and a constitutionally protected right. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994) (city's contract with lounge unenforceable because it "constituted an attempt to condition Plaintiff's receipt of a benefit upon Plaintiff's waiver of its right to free expression"); *Littlejohn v. Rose*, 768 F.2d 765, 769-70 (6th Cir. 1985) ("involvement in activity shielded by the constitutionally protected rights of privacy and liberty constitutes an impermissible reason for denying employment").[4]

---

[4] Defendant asserts that the privacy claims of the three Plaintiffs who disclosed their names are especially weak. Def. Br. 9. Although these Plaintiffs' decision not to remain anonymous as part of this litigation may be considered in evaluating their privacy interests, it should not be regarded as dispositive given the context-specific nature of the right to privacy. Plaintiffs assert a right to privacy because Defendant's Policy forces them to make repeated disclosures of their transgender status to persons who are unlikely to have seen press reports about this case and who may subject them to harassment, discrimination, or violence. Even after disclosure of information in one setting, an individual may retain "a reasonable expectation of privacy" because "[t]he fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination

In addition, Defendant fails to explain why a government policy that forces persons to disclose their private information is a less serious privacy violation than the government's direct disclosure of the information. The results in *Kallstrom* and *Bloch* would have been no different had the government forced the plaintiffs to disclose the confidential information themselves. Even assuming that the sex marker on Plaintiffs' licenses is not direct government disclosure, forcing Plaintiffs to disclose their transgender status to third parties is at least as serious an incursion on their privacy as a direct release of the information. Plaintiffs are required to reveal their transgender status to numerous strangers whose reaction may be violent in settings where there may be no one else available to assist them or call for help.

Because Defendant's Policy infringes upon Plaintiffs' constitutionally protected privacy rights, it must be reviewed under strict scrutiny. *Kallstrom*, 136 F.3d at 1064.

## II.   Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their First Amendment Rights.

The First Amendment prohibits the government from forcing an individual to convey the government's message. *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Just as the "Bill of Rights . . . guards the individual's right to speak his

---

of information." *C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) (quoting *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 770 (1989)); *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007).

own mind" so too does it prohibit "public authorities to compel him to utter what is not in his mind." *Id*. at 634; *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[f]reedom of thought protected by the First Amendment . . . includes both the right to speak freely and the right to refrain from speaking at all"). This protection extends to both "compelled statements of fact" and "compelled statements of opinion." *Rumsfeld v. Forum for Academic and Institutional Rights*, *Inc.*, 547 U.S. 47, 62 (2006); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98 (1988).

Defendant's Policy compels Plaintiffs to identify themselves by the wrong sex (*e.g*., by compelling Plaintiff Codie Stone to communicate the message that he is female even though he is male) and to broadcast private information regarding their birth-assigned sex and their transgender status to complete strangers.[5] Such information becomes known to strangers because the sex marker on Plaintiffs' licenses conflicts with their appearance and the names and photos on their licenses. Compl. ¶¶ 52, 60, 70, 77, 85, 92. If the requirement to disclose factual information about "the gross percentage of revenues retained [by a fundraiser] in prior charitable solicitations" imposes an unconstitutional burden on speech, *Riley*, 487

---

[5] People repeatedly need to use their license to verify their ID. Compl. ¶¶ 36, 93. *See also* Mich. Comp. Laws §§ 168.495, 168.497c, 168.509r, 211.7u, 257.311, 427.304, 445.486; Mich. Admin. Code R. 333.103, 338.928, 338.1009a, 460.102, 460.1602, 325.9054, 325.9074, 325.166 (requiring a State ID to prove identity or as one method to prove a person's identity).

U.S. at 784, then so too does the Policy's requirement that Plaintiffs identify themselves by the wrong sex and reveal deeply personal information about their transgender status.

Defendant suggests that the prohibition on compelled speech is limited to "ideological" speech, Def. Br. 11, but *Riley* shows that free speech protections are not so limited. "The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than remain silent…. This harm occurs regardless of whether the speech is ideological." *Axson-Flynn v. Johnson,* 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) (citations omitted).

Defendant further claims that the First Amendment is not violated by the compelled statement of fact resulting from her Policy unless "other protected expression in the license . . . is burdened by that disclosure." Def. Br. 13. But that is not the standard.

*Barnette*'s and *Wooley*'s holdings did not depend on the compelled speech burdening other protected expression, and the same is true of a compelled disclosure of fact. In *Planned Parenthood v. Daugaard*, 799 F. Supp. 2d 1048 (D.S.D. 2011), for example, a district court concluded that a law that required women to disclose to a third party intimate facts about their decision to have an abortion likely violated the First Amendment's protections against compelled

13

speech. *Id.* at 1055-58.[6] It did so even though the compelled disclosure failed to burden any other protected expression.

In any event, forcing a transgender person to produce a license with the wrong sex on it does in fact burden constitutionally protected speech. Requiring Plaintiffs to carry the government's message about their sex—that they are male or female when they are not—prevents them from communicating their own constitutionally protected messages. For example, Codie Stone's ability to convey his constitutionally protected message that he is male, even though he was assigned the wrong sex at birth, is undermined by being compelled to carry the government's message that he is female. *See Doe v. Bell*, 754 N.Y.S.2d 846, 851 (Sup. Ct. 2003) (transgender student's decision to wear female clothes conveyed particularized message about her gender identity); *accord Doe ex rel. Doe v. Yuntis*, No. 001060A, 2000 WL 33162199, at *6 (Mass. Super. Ct. Oct. 11, 2000), *aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).

---

[6] *Rumsfeld* is easily distinguished. The Solomon Amendment did "not dictate the content of [law schools'] speech at all" but only required law schools to offer the same speech for military recruiters that they offered to other recruiters and allowed law schools to dissociate themselves from the military recruiters. 547 U.S. at 62, 65. In contrast, Defendant's Policy dictates that Plaintiffs' licenses disclose the wrong sex and that they are transgender, and any efforts by Plaintiffs to distance themselves from the impact of displaying their IDs would be useless.

14

Defendant's Policy also requires Plaintiffs to communicate Defendant's
*opinion* that they are a sex which they are not. Defendant argues "there is no
opinion being expressed in the display of sex on [Plaintiffs'] driver's license—only
a simple statement of factual data." Def. Br. 12. According to Defendant, "the
identification of sex on the driver's license[ ] is only a description of the person's
physical body, not their gender identity." Def. Br. 24. But that is simply not an
accurate description of Defendant's Policy. For persons seeking to correct the sex
on their existing license, Michigan driver's licenses display the sex that is currently
listed on a person's birth certificate. If a transgender person was born in a state that
allows individuals to change the sex on their birth certificate without having
gender confirmation surgery, then they will receive a license that lists their correct
sex regardless of what their "physical body" looks like. In other words, two
different transgender people with similar physical bodies will receive different sex
designations on their Michigan license based solely on where they were born.[7]

For this reason, a designation of M or F on a transgender individual's
Michigan license has no factual connection to the person's "physical body" or

---

[7] In this case, Defendant cannot argue that Plaintiff's request not to be compelled to
communicate a sex with which they do not identify is a "'message with which [the
state] do[es] not wish to be associated." Def. Br.13 (citing *Walker* at *18 (citing
*Pleasant Grove City v. Summum*, 555 U.S. 460, 471 (2009)). Defendant already
allows people applying for a new ID or born in states that do not proscribe or place
undue burdens on changing the sex designation in birth certificates to be free from
such government-compelled message.

chromosomes. Rather, the M or F designation reflects the government's opinion about whether they should be recognized as a man or a woman. Thus, Defendant's policy forces Plaintiffs "as part of [their] daily li[ves]—indeed constantly while . . . in public view—to be an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).  Such government-compelled communication about something as fundamental as a person's sex cannot be squared with the First Amendment.[8]

Because Defendant's Policy infringes upon Plaintiffs' First Amendment rights, the Policy must be reviewed under strict scrutiny. *Riley*, 487 U.S. at 800.

**III.    Plaintiffs Have Adequately Pled That the Driver's License Policy Violates the Equal Protection Clause of the Fourteenth Amendment.**

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quotation and citation omitted). The Driver's License Policy violates equal protection by treating individuals seeking to correct the sex on their State ID differently based on the person's state of birth.

---

[8] The Supreme Court's ruling in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.,* 135 S. Ct. 2239 (2015) does not affect Plaintiffs compelled-speech claim. Relying on *Walker*, Defendant argues that "identification information alone [is] not speech," Def. Br.13 of any sort, and compares the "state names and vehicle identification numbers" on license plates discussed in *Walker* to "a person's sex as displayed on their driver's license." *Id.* at 13-14. But this is inapposite for the reasons discussed above—the sex listed on a Michigan driver's license is not merely a fact, but Defendant's opinion about each Plaintiff's sex.

Transgender people who are from a state that makes it impossible or difficult to amend the sex on their birth certificate are substantially similar to persons who were born in states where gender changes can be secured without undergoing surgery or seeking a court order. Yet the Policy treats these two groups differently.

The Policy makes it possible for people who were born in a state that does not require surgery or a court order to correct the sex on their birth certificate to obtain a license with the correct sex designation, even if they have not had surgery or are unable to secure a court order. Compl. ¶¶ 4-6. On the other hand, the Policy makes it impossible or places serious burdens on transgender people who were born in a state that refuses to change the sex on a birth certificate, or requires surgery or a court order to amend the sex on their birth certificate. *Id.*[9]

Moreover, the Policy treats transgender individuals differently from non-transgender individuals in that only they have to satisfy an additional evidentiary burden, in showing an amended birth certificate, in order to have an accurate ID. Plaintiffs are similarly situated to persons who wish to correct other identifying characteristics on their licenses, since transgender and non-transgender persons are

_____

[9] In *Somers v. Superior Court of San Francisco City and Cnty.*, 172 Cal. App. 4th 1407 (2009), the court addressed a similar equal protection and right to travel challenge to a law that required California-born residents seeking a change of the sex designation on their birth certificate to petition for that change in their county of residence. The court concluded that a law treating California-born transgender individuals who reside out of the state differently from California transgender resident who reside in California was unconstitutional, because there was "no rational basis for the disparate treatment." *Id.* at 1416.

17

alike in their need to have an accurate state driver's license. However, non-transgender individuals do not have to present any proof in order to change other physical characteristics on their IDs.[10]

Defendant's Policy applies explicitly to "changing sex," Def. Br. Ex. A; Compl. ¶ 2, and determines whether Michiganders may have an M or F on their license. On its face, therefore, the Policy classifies based on sex. *See United States v. Virginia*, 518 U.S. 515, 555 (1996) ("[A]ll gender-based classifications today warrant heightened scrutiny.") (internal quotations marks omitted); *see also Califano v. Westcott*, 443 U.S. 76, 83-85 (1979) (applying heightened scrutiny to sex-based classification even if the effects of its application are felt equally by men and women); *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) (striking down preemptory challenges based on gender-based assumptions as to *both* sexes, despite equal application of the rule as to men and women).

---

[10] Defendant argues that Plaintiffs are not similarly situated to Michiganders wanting to correct eye color or height because those characteristics are "visible and external" and "readily observable without invasive verification." Def. Br. 16-17. Sex, however, is readily observable, as reflected in Plaintiffs' observable physical appearance, including breast development, facial hair, and body fat distribution, as well as their dress and hairstyle. *See K.L.*, 2012 WL 2685183, at *7 ("By not allowing transgender[ ] individuals to change their sex designation, their license will *inaccurately describe the discernable appearance* of the license holder by not reflecting the holder's lived gender expression of identity.") (Emphasis added). Any other physical characteristics of a transgender person, such as their genital status, are irrelevant for identification purposes, since they are "physical features which are concealed from and not apparently discernable to the public." *Id.*

Defendant's Policy makes it impossible or extremely burdensome for some seeking to correct the sex on their existing licenses to do so. Thus the Policy discriminates against persons born in certain states on the basis of sex. "'Sex-plus' discrimination exists when a person is subjected to disparate treatment based not only on . . . sex, but on . . . sex considered in conjunction with a second characteristic." *Derungs v. Wal-Mart Stores, Inc.,* 374 F.3d 428, 439 n.8 (6th Cir. 2004); *see also Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (discrimination against a woman who is a mother is sex discrimination "whether a claim is characterized as 'sex plus' or 'gender plus,'" so long as "plaintiff provides evidence of purposefully sex-discriminatory acts"). Defendant's Policy discriminates against Plaintiffs on the basis of sex in denying them an accurate ID by burdening their ability to correct the sex on their license because of where they were born.

Defendant's Policy also discriminates on the basis of sex because it denies *only* transgender persons the right to an accurate license. Compl. ¶ 39. *See Glen v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual … is sex discrimination."). Finally, the Policy discriminates on the basis of sex, because it discriminates based on a person's need to change the sex designation on a license. *Cf. Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (holding in employment context that discrimination because of a

19

person's change from one sex to another is discrimination "because of sex" for purposes of Title VII).

Classifications based on sex, such as Defendant's Policy, must be reviewed under heightened scrutiny. *Virginia*, 518 U.S. at 555.

## IV.    Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their Right to Interstate Travel.

The Driver's License Policy violates the right to interstate travel of Plaintiffs Tina Seitz, Codie Stone, and E.B., who were born in states that make it impossible to change the sex on their birth certificates, and of Plaintiff K.S., who was born in a state requiring him to secure a court order to amend the sex on his birth certificate. The Policy imposes insurmountable or significant burdens on those Plaintiffs due to their birth out of state as compared to persons born in Michigan.

In *Saenz v. Roe*, 526 U.S. 489 (1999), the Supreme Court struck down a law that is very similar to Defendant's Policy—a California law limiting the welfare benefits of a newly arrived family to the amount they received in their prior state of residence for the first year after their arrival. *Id.* at 492. The case involved the right of "travelers who elect to become permanent residents . . . to be treated like other citizens of that State." *Id.* at 500. Laws that discriminate against permanent residents because they are newcomers violate the Privileges or Immunities Clause of the Fourteenth Amendment. *Id.* at 503-04. Disadvantaging a newcomer for not living in a state on a fixed date—such as a person's date of birth—violates the right

20

to travel in the same way as laws that discriminate based on the number of years a newcomer has lived in the new state, since the right is concerned with "equality of rights with every other citizen." *Id.* at 504; *see also Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 905 (1986) (Law favoring "veterans who were New York residents at a past fixed point over those who were not New York residents at the same point in their lives" violated the right to travel).

As with the law that set welfare benefit levels in California based on the law in newcomers' former states of residence, Defendant's Policy sets the rule for sex designation changes on Michigan licenses based on the rules for amending birth certificates in newcomers' states of birth. Plaintiffs are challenging Defendant's incorporation of out-of-state rules for changing the sex on a birth certificate as the criteria for securing an accurate Michigan license. Defendant's argument that her policy "treats all Michiganders alike, regardless of whether there were born in Michigan or elsewhere," Def. Br. 26, ignores the Policy's practical effect. The same formalistic argument could have been made about the law struck down in *Saenz.* Both laws place newcomer residents from certain states at a disadvantage because of their adoption of laws of the newcomers' prior states of residency—a quintessential right-to-travel violation.

Defendant cites *Hayes v. Bd. of Regents of Kentucky State University*, 495 F.2d 1326 (6th Cir. 1974), and *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014),

*rev'd sub nom. Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), but both are easily distinguishable. *Hayes*, which pre-dates *Saenz*, involved the narrow issue of "whether voter registration is conclusive of citizenship as defined in the Fourteenth Amendment," *Hayes*, 495 F.2d at 1327, rather than the right of newcomer *permanent* residents "to be treated like other citizens of that State," *Saenz*, 526 U.S. at 500; *see also id.* at 502 ("Permissible justifications for discrimination between residents and nonresidents are simply inapplicable to a nonresident's exercise of the right to move into another State and become a resident of that State."). To the extent that *DeBoer* has any persuasive authority after reversal, it is also distinguishable, since it involved a claim that states that refused to recognize the marriages of newly resident same-sex couples violated those couples' right to travel. Unlike the Policy challenged in this case, those state marriage laws did "not punish out-of-state new residents in relation to its own born and bred." *DeBoer*, 772 F.3d at 420. There was no "differential treatment between the newly resident and the longstanding resident," *id.*, as there is in the present case.

Because Defendant's Policy infringes upon the right to travel of Plaintiffs Seitz, Stone, E.B., and K.S., it must be reviewed under heightened scrutiny. *Saenz*, 526 U.S. at 503-04.

**V.    Plaintiffs Have Adequately Pled That Defendant's Policy Violates Their Due Process Right to Avoid Forced Medical Treatment.**

Defendant's Policy violates the substantive due process rights of Plaintiffs Emani Love and A.M., since it forces them to undergo medical treatment that is unwanted, unnecessary or unavailable to them.  Compl. ¶¶ 51, 56, 136-37. For many transgender individuals, surgery is not medically necessary, may be contraindicated, and is cost-prohibitive.  *Id.* ¶¶ 34, 135. Yet for a transgender person born in Michigan, the sex on their birth certificate cannot be changed unless they first undergo gender confirmation surgery. *Id.* ¶¶ 50, 59.

The liberty interest protected by the due process clause includes an "interest in independence in making certain kinds of important decisions," *Whalen*, 429 U.S. at 599-600 & n.26, including the right to refuse unwanted medical treatment. *Sell v. United States*, 539 U.S. 166, 179 (2003). Defendant's Policy unjustifiably infringes on those constitutionally protected interests because it forces Plaintiffs Love and A.M. to undergo surgery in order to obtain an accurate State ID.

Defendant concedes that Plaintiffs "have a liberty interest in refusing unwanted medical treatment," but asserts that "no medical treatment is being forced upon Plaintiffs" because her Policy does not literally require surgery. Def. Br. 27. However, it is undisputed that if a transgender person born in Michigan wishes to correct the sex marker on their driver's license, they must first undergo a surgical procedure in order to amend their birth certificate. As discussed in Section

23

I *supra*, the government may not condition a person's right to a government benefit on that person's willingness to sacrifice their constitutional rights. *See, e.g., Littlejohn*, 768 F.2d at 769-70 (teacher may not be denied public employment because of exercise of constitutional right to end marriage through divorce); *see also Lebron v. Sec'y of the Fla. Dep't of Children & Families*, 772 F.3d 1352, 1376 (11th Cir. 2014) (statute conditioning person's right to welfare on consent to warrantless, suspicionless drug test violated Fourth Amendment). In this case, Defendant's Policy forces Plaintiffs to choose between an accurate license and an invasive medical procedure.

*U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588 (6th Cir. 2013), fails to bolster Defendant's argument. The case challenged the requirement that individuals obtain *health insurance*. In contrast to Defendant's Policy, "[t]he individual mandate does not implicate the fundamental liberty right," since it "requires either the purchase of health insurance or the payment of a shared responsibility payment," leaving "Plaintiffs . . . free to choose their medical providers and the medical treatments they will or will not accept." *Id.* at 601.[11]

---

[11] Defendant incorrectly characterizes the relief Plaintiffs seek as an expansion of substantive due process. Def. Br. 29. Plaintiffs Love and A.M. are arguing for enforcement of established law protecting their right to refuse unwanted medical treatment. *See* n. 3, *supra.*

24

Because Defendant's Policy implicates Plaintiffs' right to avoid unwanted

medical treatment, the Policy must be reviewed under a heightened scrutiny. *Sell*,

539 U.S. at 179.

## VI.   Plaintiffs Have Adequately Pled That Defendant's Policy Fails Even Rational Basis Review.

As shown in Sections I-V, *supra*, Defendant's Policy should be reviewed

under heightened scrutiny. However, because it fails even rational basis review, the

Policy cannot survive review under heightened scrutiny.

Under rational basis review, "a plaintiff may demonstrate that the

government action lacks a rational basis . . . either by negativing every conceivable

basis which might support the government action, or by demonstrating that the

challenged government action was motivated by animus or ill-will." *Davis v.

Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (internal quotation marks

omitted). To survive rational basis scrutiny, a law must be "narrow enough in

scope and grounded in a sufficient factual context for [courts] to ascertain some

relation between the classification and the purpose it serve[s]." *Romer v. Evans*,

517 U.S. 620, 632-33 (1996). The connection between the purported justification

and the classification cannot be "so attenuated as to render the distinction arbitrary

or irrational." *City of Cleburne, Tex.*, 473 U.S. at 446.

There is no rational basis for Defendant's Policy. Defendant articulates two

purported governmental interests:  (1) "maintaining accurate state identification

25

documents" to "promote effective law enforcement" and (2) ensuring "that the information on the license is consistent with other state records describing the individual." Def. Br. 23-24. Defendant claims a related interest in (3) the accurate "identification of sex" on a driver's license based on "the person's physical body." *Id.* at 24. Defendant's Policy is not rationally related to any of these asserted interests.

There is no rational connection between Defendant's Policy and the promotion of accurate state identification documents to promote law enforcement. Because of the Policy, the sex listed on Plaintiffs' licenses fails to match their appearance and the sex associated with their names. The Policy therefore undermines, rather than furthers, any state interest in accurately identifying Plaintiffs. For this reason, an Alaska court found that a state policy barring changes to the sex designation on a driver's license violated the Alaska Constitution. *K.L.*, 2012 WL 2685183. The court reasoned that

> [b]y not allowing transgender[] individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity. Thus, when such individuals furnish their license to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the license.

*Id.*, at *7.[12]

      Defendant's Policy also fails to further an interest in consistency "with other state records describing the individual." First, to the extent that this alleged interest is focused on consistency with the sex on a person's birth certificate, the interest is simply a restatement of the Policy rather than an "independent . . . legislative end" for the line drawn by the Policy. *Romer,* 517 U.S at 635 (1996) ("[A] classification of persons undertaken for its own sake" is "something the Equal Protection Clause does not permit."); *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881-82 (1985) (refusing to accept "promotion of domestic industry" as a legitimate state interest for state law imposing "discriminatory tax burden on foreign insurers").

---

[12] *Dean v. United States*, 436 F. Supp. 2d 485, 488 (E.D.N.Y 2006), fails to support Defendant's argument that her Policy serves an interest in accurate driver's licenses "to promote effective law enforcement." Def. Br. 23. *Dean* concerned a request for expungement of accurate arrest records, even though retention of such records serves a law enforcement purpose. In contrast, Defendant's Policy fails to further any law enforcement purpose, since it undermines the accuracy of Plaintiffs' licenses for identification purposes. *Forbush v. Wallace*, 341 F. Supp. 217 (M.D. Ala. 1971) *aff'd*, 405 U.S. 970 (1972), is also inapposite since it involved a state law requiring married women to list their legal married name, rather than their maiden name, on their license. In contrast to the "confusion which would result if each driver were allowed to obtain licenses in any number of names," *id.* at 222, Plaintiffs are seeking *one* State ID that accurately reflects their lived sex. In addition, in *Forbush* the court noted that a woman who wished to have her maiden name on her license was able to pursue "a simple, inexpensive means" to "change … her [legal] name," *id.*, whereas there is no simple, inexpensive means for Plaintiffs to correct the sex on their birth certificate in order to correct it on their license.

Additionally, there is no logical reason why Michigan would have a state interest in ensuring consistency between Michigan driver's license records and out-of-state birth records over which it has neither access nor control. And in contrast to sex designation changes, Defendant does not require individuals who wish to change their name on their license to change the name on their birth certificate[13]— even though names arguably serve a more important role in identifying a person. In addition, transgender persons who are new applicants for a Michigan license are not required to produce an amended birth certificate to secure a license that matches their gender identity and lived sex. Compl. ¶ 6.[14] As a result, there is no requirement that the sex on the licenses of new transgender applicants for a license match the sex on their birth certificates. Defendant's Policy also *creates* inconsistencies between Plaintiffs' licenses and their federal identification documents, such as passports and Social Security records. *Id.* ¶ 58, 64. Therefore, consistency with other state identity records has no rational connection to Defendant's Policy. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (purported rationales for legislation must be rejected if "an

---

[13] *See* note 7, *supra.*

[14] Transgender persons can amend the sex on their passport without amending the gender on their birth certificate, Compl. ¶ 10, and can use their "unexpired U.S. passport or passport card" as a valid form of identification in applying for a driver's license for the first time. *Applying for a License or ID? Applicant Checklist*, Ruth Johnson, Secretary of State, *available at* http://www.michigan.gov/sos/0,4670,7-127-1627_8669_9040_9043-312849--,00.html.

examination of the circumstances forces us to conclude that they could not have been a goal of the legislation") (internal quotation marks omitted)).

Finally, Defendant's Policy has no connection to a purported interest in accurate identification of sex based on a person's "physical body," since the Policy requires an amended birth certificate, rather than any particular surgical procedure or genital characteristics. For residents who were born in Michigan the Policy requires surgery in order to correct the sex on their license. However, Michigan's birth certificate law only requires completion of "sex-reassignment surgery," Mich. Comp. Laws § 333.2831(c), which may include one or more of facial feminization, breast reduction or augmentation, and/or genital reconstruction surgery. Compl. ¶ 34. Only about one-third of transgender respondents to a national survey reported having completed gender confirmation surgery. *Id.* As a result, even for residents born in Michigan, Defendant's Policy has only an extremely tangential relationship to a person's anatomy, such as their genital status.

For Michiganders born in a state where no surgery or any other medical treatment is required to change the sex on a transgender person's birth certificate, the Policy has no relationship at all to an interest in ensuring that the sex on a person's license matches their physical characteristics. Persons with the same or similar genital characteristics might have different sex markers listed on their

29

license depending on where they were born and whether they are obtaining their first or a renewed Michigan ID.

For Michigan residents born in states where sex designation changes on birth certificates are unavailable or burdensome to secure, such as Plaintiffs Seitz, Stone, and E.B., the Policy undermines any interest in accurately matching the sex on a person's license with their physical characteristics, since the gender on the license can never be changed regardless of the person's physical characteristics. That is so because no matter how many surgeries or other medical interventions Plaintiffs and others undergo, they are either forever denied or forced to overcome a serious burden in order to secure a license that matches their physical characteristics. Thus, even if Defendant intended for the sex on a license to reflect a person's physical characteristics, Defendant's Policy is not rationally related to that asserted goal. *See Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 621-22 (1985) (Statute "not written to require any connection between the veteran's prior residence and military service" failed rational basis review).[15]

Defendant does not claim her Policy prevents fraud, but in any event, it is inconceivable that Defendant's Policy is rationally related to such an interest.

_____

[15] For the same reasons, Defendant's Policy is also unrelated to any interest in deciding who will conduct a search or in which jail a person should be placed. Moreover, federal law requires that placement decisions for transgender persons be made on an individualized basis, rather than simply based on anatomical status. *See* 28 C.F.R. § 115.42(c).

30

Since the Policy makes accurate identification *more* difficult, it undermines any

interest in fraud prevention rather than enhancing it. To the extent that the sex

listed on a license could be used to commit fraud, Michigan already addresses such

concerns by prohibiting possession of a "fictitious" license and voiding a license

that was issued based on false information.  Mich. Comp. Laws § 257.324 (1)(a) &

(2). Moreover, even if accuracy of identity and fraud prevention were Defendant's

goals, her Policy of determining whether a transgender person can obtain an

accurate ID based on their state of birth or whether they are applying for a new

license or a renewal is completely unrelated to those purposes.

## **CONCLUSION**

Plaintiffs request that this Court deny Defendant's Motion to Dismiss.

Dated: August 24, 2015

Michael J. Steinberg (P43085)
Jay D. Kaplan (P38197)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
   of Michigan
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org
jkaplan@aclumich.org
dkorobkin@aclumich.org

John Knight
American Civil Liberties Union Foundation
180 N. Michigan Avenue, Suite 2300
Chicago, IL 60606
(312) 201-9740
jaknight@aclu.org

Respectfully submitted,

*/s/ Michael F. Derksen*
Steven R. Gilford
Michael F. Derksen
Jacki L. Anderson
PROSKAUER ROSE LLP
70 West Madison, Suite 3200
Chicago, IL 60602
(312) 962-3550
sgilford@proskauer.com
mderksen@proskauer.com
jlanderson@proskauer.com

*Attorneys for Plaintiffs*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed electronically using the Court's

ECF system, which will provide electronic notice to all counsel of record.

Dated:  August 24, 2015

<u>/s/ Michael F. Derksen</u>
Michael F. Derksen
PROSKAUER ROSE LLP
70 W. Madison
Suite 3800
Chicago, IL 60602
mderksen@proskauer.com