UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMANI LOVE, ET AL.,

       Plaintiffs,

v.

RUTH JOHNSON,

       Defendant.

_____/

Case No. 15-11834

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS [16]**

Plaintiffs, a group of transgender individuals, filed this civil rights lawsuit against the Michigan Secretary of State seeking a declaration that the department's policy for changing the sex on a state-issued ID is unconstitutional. According to the complaint, the policy has made it unduly burdensome–and in some cases impossible–for Plaintiffs and others like them to obtain a state ID that accurately reflects their gender. In this way, Plaintiffs are forced to rely on an official ID that does not conform with their physical appearance. This, they maintain, indirectly divulges their transgender status to complete strangers and places them at serious risk of harm.

Currently before the Court is Defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). According to Defendant, even accepting the allegations in the complaint as true, Plaintiffs have failed to assert a claim of constitutional dimension.

For the reasons discussed more fully below, the Court finds that Plaintiffs have raised a cognizable privacy claim under the Fourteenth Amendment to the U.S. Constitution. The

Court further declines to address the substantive merit of Plaintiffs remaining claims on the principle of judicial restraint.  Accordingly, Defendant's motion is DENIED.

## I.    BACKGROUND

Plaintiffs are six transgender individuals whose gender identity does not conform to the sex they were assigned at birth.[1]  "Gender identity" commonly refers to "a person's internal sense of being male, female or something else[.]" American Psychological Association Publication, *available at* http://www.apa.org/topics/lgbt/transgender.aspx. "Sex assigned at birth" on the other hand, refers "to one's biological status as either male or female, and is associated primarily with physical attributes . . . ." *Id.*  A transgender person may decide to undergo "gender transition"–the complex process of altering a person's birth-assigned sex–which may involve one or more of the following: "adopting the appearance of the desired sex through changes in clothing and grooming, adopting a new name, changing sex designation on identity documents (if possible), using hormone therapy treatment, and/or undergoing medical procedures . . . ." *Id.*  Plaintiffs' complaint focuses on the Michigan Secretary of State's alleged role in impeding the gender transition process by establishing unduly burdensome requirements for transgender individuals to alter the gender designation on their state IDs.

In 2011, Michigan Secretary of State Ruth Johnson ("Johnson" or "Defendant") implemented a new policy (the "Policy") for "changing sex" on a state ID.  The Policy provides as follows:

An applicant may request to change the sex on their driver license or

---

[1] According to the American Psychological Association, "[t]ransgender is an umbrella term for persons whose *gender identity, gender expression* or behavior does not conform to that typically associated with the sex to which they were assigned at birth."  APA Publication, *available at* http://www.apa.org/topics/lgbt/transgender.aspx

[personal identification card]. The individual must provide a certified birth certificate showing the sex of the applicant. A birth certificate is the <u>only</u> document accepted as proof to change an individual's sex.  A U.S. passport cannot be accepted as proof of a sex change.

(Def.'s Br. Ex. A, Identification Policy) (emphasis in original). Under the Policy, then, transgender individuals must procure an amended birth certificate in order to obtain a new state ID.[2]   Plaintiffs maintain that this requirement places "onerous and in some cases insurmountable obstacles to prevent transgender persons from correcting the gender on driver's licenses and state IDs . . . [and] stands in contrast with the decisions of the federal government and numerous states to ease restrictions on changing gender on identity documents . . . ." (Compl. ¶ 45).  Indeed, according to Plaintiffs, the U.S. Department of State only requires a doctor's certification that a person "has had appropriate clinical treatment for gender transition" to change the gender on his or her passport. (*Id.* at ¶ 45(a)).  Likewise, "[a]t least 25 of the States and the District of Columbia do not require a transgender person to undergo surgery to change the gender" on their state ID. (*Id.* ¶ 45(c)).

Because state laws differ in terms of whether and how an individual can amend the gender on their birth certificate, the practical effect of the Policy varies.  Under Michigan law, Plaintiffs Emani Love and A.M. are required to undergo sex-reassignment surgery to procure an amended birth certificate.  (*Id.* at ¶5(c)).  By contrast, Plaintiffs Tina Seitz, Codie Stone, and E.B. "cannot obtain an accurate [Michigan] driver's license under any circumstances because their state of birth does not allow them to amend the gender on

---

[2] Interestingly, Plaintiffs assert that "Michigan residents obtaining a new driver's license or state ID for the first time are not required to present a birth certificate at all in order to obtain a driver's license or state ID listing the correct gender." (Compl. ¶ 6).

their birth certificate." (Compl. ¶ 5(a)).  In this way, the Policy creates various subclasses based solely on an individual's state of birth.

Notwithstanding the obvious importance of an accurate state ID, Plaintiffs contend that the Policy indirectly requires them to reveal "their transgender status, their transition, and/or medical condition to all who see [their] licenses, including complete strangers." (*Id.* ¶ 93).  Based on their own experiences and "data regarding the high incidence of hate crimes among transgender individuals", Plaintiffs allege that the forced disclosure of their status places them at great risk of bodily injury. (Compl. ¶ 94-95). This, in addition to the harassment, embarrassment, and "psychological injury by labeling them by the wrong sex", is the driving force behind Plaintiffs' complaint. (Plfs.' Resp. 4).  Plaintiffs now seek a declaration that the Policy is unconstitutional on the basis that it impermissibly interferes with their right to free speech, substantive due process, and equal protection under the law. Plaintiffs further allege that the Policy implicates their right to travel and autonomy in medical decision-making. Defendant, for her part, maintains that each of Plaintiffs' five claims are substantively devoid of merit and should be dismissed on the pleadings.

## II.   STANDARD OF REVIEW

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 924–25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to

4

state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Id.* at 679, 129 S.Ct. 1937 (quoting Fed.R.Civ.P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

Moreover, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir.2007) (citing Fed.R.Civ.P. 10(c)). "A court may also consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336. In addition documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim.*" Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999) (internal quotation marks and citations omitted).

## III.   ANALYSIS

Plaintiffs assert five constitutional claims against Michigan Secretary of State Ruth Johnson ("Johnson" or "Defendant") pursuant to 42 U.S.C. § 1983.  Section 1983 imposes civil liability on a person acting under color of state law who "deprives another of the 'rights,

5

privileges, or immunities secured by the Constitution and laws.' " *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998) (quoting 42 U.S.C. § 1983). The preliminary question, therefore, is whether Johnson deprived Plaintiffs of a right "secured by the Constitution and laws." *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2691 (1979).

### A. Substantive Due Process- Fundamental Right to Privacy

According to Plaintiffs, the State's Identification Policy (the "Policy") violates their right to privacy under the Due Process Clause of the Fourteenth Amendment because it forces them to reveal their transgender status to complete strangers. This disclosure of highly personal and intimate information, Plaintiffs maintain, is both embarrassing and places them at great risk of bodily harm.

The Supreme Court has long recognized that the Due Process Clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them . . . ." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665 (1986). This "substantive component" of the Due Process Clause "includes not only privileges and rights expressly enumerated by the Bill of Rights, but [also] the fundamental rights 'implicit in the concept of ordered liberty.' " *Kallstrom,* 136 F.3d at 1060 (citing *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726 (1973) (quotations omitted)). Two types of interests have been identified as protected "by the right to privacy that is rooted in [] substantive due process"- the interest in "independence in making certain kinds of important decisions," and the "interest in avoiding disclosure of personal matters." *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008) (quoting *Whalen v. Roe,* 429 U.S. 589, 599-600, 97 S.Ct 869 (1977); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 465, 97 S.Ct. 2777 (1977)). Plaintiffs' claim implicates

6

the latter interest, which the Sixth Circuit has described as the right to "informational privacy." *Id.* (quoting *Bloch v. Ribar,* 156 F. 3d 673, 683 (6th Cir. 1998). A plaintiff alleging a violation of her right to informational privacy must demonstrate that the interest at stake relates to a "fundamental liberty interest." *Id.* "Only after a fundamental right is identified should the court proceed to the next step of the analysis- balancing of the government's interest in disseminating the information against the individual's interest in keeping the information private." *Id.*

The Sixth Circuit has "recognized an informational-privacy interest of constitutional dimension in only two instances: (1) where the release of personal information could lead to bodily harm (*Kallstrom*), and (2) where the information released was of a sexual, personal, and humiliating nature (*Bloch*)." *Id.* Here, Plaintiffs maintain that the Policy endangers "their personal security and bodily integrity . . . ." (Plfs' Resp. 7). In other words, Plaintiffs assert that the disclosure of their transgender status implicates the liberty interests identified under *Kallstrom* and *Bloch*.

In *Kallstrom*, the plaintiffs were three undercover police officers who were actively involved in a drug conspiracy investigation of the Short North Posse; a violent gang in the Columbus, Ohio area. 136 F.3d at 1059. The Government indicted 41 members of the gang and the plaintiffs testified at the trial of eight of the defendants. *Id.* During the trial, the city released the personnel records of the undercover officers to defense counsel, who then shared the information with the defendants. *Id.* The records contained, among other information, the names and addresses of the officers and their immediate family members. *Id.* Notwithstanding the seemingly obvious security breach associated with this disclosure, the city had previously assured the officers that their personal information would be held

in strict confidence. *Id.* The officers later filed suit against the city contending that the release of their personnel files infringed upon their right to privacy under the Fourteenth Amendment.

On appeal, the Sixth Circuit had little trouble concluding that the officers' privacy interests were of "constitutional dimension" because they implicated a fundamental interest in "preserving their lives and the lives of . . . their family members, as well as preserving their personal security and bodily integrity." *Id.* at 1062. This interest, according to the court, is implicated "where the release of private information places an individual at substantial risk of bodily harm . . . from a perceived likely threat, . . . ." *Id.* at 1064. Indeed, there is a long line of cases dating back to the nineteenth century recognizing that "individuals have a constitutional right to avoid the kind of *physical* invasions or abuse that 'strip[] the very essence of personhood.' " *Lambert*, 517 F.3d 433, 441 (emphasis in original) (quoting *Kallstrom,* 136 F.3d at 1063.). In essence, then, *Kallstrom* appears to stand for a relatively broad proposition; namely, that individuals have a fundamental privacy interest in the disclosure of personal information likely to lead to the threat of bodily harm.

The Sixth Circuit has also recognized the constitutional right to informational privacy in the context of "personal sexual matters." In *Bloch v. Ribar*, the court considered whether the plaintiff had a fundamental right "to prevent the dissemination of confidential and intimate details of a rape . . . . " 156 F.3d 673, 686 (6th Cir. 1998). The plaintiff's claim was triggered by a press conference in which the county sheriff released "highly personal and extremely humiliating details of the rape suffered by Ms. Bloch . . . [including] details of the acts perpetrated against her that were so embarrassing she had not even told her husband." *Id.* at 676. The court, relying on the same logic employed in *Kallstrom*,

8

explained that "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publically revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private." *Id.* at 685. Against this backdrop, the court concluded that "information regarding private sexual matters warrants constitutional protection against public dissemination." *Id.*

According to Plaintiffs, "because the Policy requires [them] to carry an ID with a sex that conflicts with their lived sex, Defendant forces them to reveal their transgender status to complete strangers." (Plfs' Resp. 6). This disclosure, Plaintiffs maintain, "places them at serious risk of physical harm, endangering their personal security and bodily integrity and thereby rising to constitutional dimensions." (*Id.* at 6-7). Defendant, for her part, argues that, "in contrast to the 'very real threat' in *Kallstrom* posted by a violent gang against the undercover officers who . . . testified against them, Plaintiffs cite to statistics about the risks to transgender individuals in general, and allege hypothetical risks . . . . '" (Def.'s Br. 7).

The Court is not persuaded by Defendant's logic for a number of reasons. First, the *Kallstrom* court unambiguously identified the right to personal security and bodily integrity "from a *perceived likely threat* . . . ." *Kallstrom,* 136 F.3d at 1064 (emphasis added). In other words, contrary to Defendant's suggestion, "hypothetical risk" plays an important role in determining whether Plaintiffs' privacy claim implicates a fundamental liberty interest. Here, Plaintiffs have offered a plethora of evidence which, accepted as true, suggests that the Policy poses a real threat to their "personal security and bodily integrity." *Id.* at 1062. Indeed, in addition to general statistics "regarding the high incidence of hate crimes among transgender individuals . . . when their transgender status is revealed", (Compl. ¶ 95),

9

Plaintiffs point to first-hand experience of "harassing conduct that transgender persons often live through when forced to produce an ID document that fails to match their lived gender." (Compl. ¶ 97); *see* (Compl. ¶ 101) ("Emani Love was publicly embarrassed when she went to vote and the precinct worker outed her as transgender after looking at her state I.D. which incorrectly lists her gender as male); (Compl. ¶ 102) ("E.B. felt awkward and embarrassed when he was asked for an I.D. to order a a drink at a bar and after seeing the ID, the server started calling him 'ma'am' "); (Compl. ¶ 103) ("When Tina Seitz had to show her driver's license at a retail store . . . the clerk looked at her license and said 'that's not you.' "); (*Id.*) ("Codie Stone had a hostile experience at a hardware store where the clerk was extremely friendly to him before he produced his license after which the clerk's tone and demeanor changed completely when he provided his license listing the incorrect gender."). These allegations cut at the "very essence of personhood" protected under the substantive component of the Due Process Clause. *Kallstrom,* 136 F.3d at 1063.

The Second Circuit, in *Powell v. Schriver,* specifically recognized the "hostility and intolerance" toward transsexuals in support of its conclusion that "the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism." 175 F.3d 107, 111 (2nd Cir. 1999). In *Powell*, the plaintiff argued that the defendant violated her constitutional right to privacy by disclosing to other inmates that she was an HIV-positive transsexual. *Id.* at 109. The court, beginning with the bedrock principle that "there exists in the . . . Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters[]' ", explained that "transsexualism is the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Id.* at 111 (citations omitted). This observation,

10

in conjunction with the "obvious [fact] that an individual who reveals that she is a transsexual 'potentially exposes herself . . . to discrimination and intolerance[]", led the court–in fairly summary fashion–to conclude that "transsexuals are among those who possess a constitutional right to maintain medical confidentiality." *Id.* at 112.

From a high-level perspective, the court's reasoning in *Powell* is no different from *Kallstrom*.[3]  Both courts placed great emphasis on the risk of physical harm stemming from the disclosure of certain personal information. *See Id.* at 113 ("in the sexually charged atmosphere of most prison settings, [the disclosure of an inmate's transsexualism] might lead to inmate-on-inmate violence.").  Here, there is no question that "[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate." *Id.* at 111 (citing *Farmer v. Moritsugu*, 163 F.3d 610, 611 (D.C. Cir. 1998) (describing transsexualism as "a gender identity disorder, the sufferers of which believe they are 'cruelly imprisoned within a body incompatible with their real gender identity, . . . . ' ").  Moreover, Plaintiffs, relying on their own experiences and the findings of several well-documented studies, maintain that there is a great deal of animosity towards the transgender community.  Similar to *Kallstrom*, the Court finds "no reason to doubt that where disclosure of this [highly intimate] information may fall into the hands of persons" harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity. *Kallstrom,* 136 F.3d at 1063.  Accordingly, the Court finds that by requiring Plaintiffs to disclose their transgender status, the Policy directly implicates their fundamental right of privacy.

---

[3] In fact, Defendant makes no attempt to distinguish *Powell.*

11

Where, as here, state action infringes upon a fundamental right, "such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest, and is narrowly drawn to further that state interest."[4] *Id.* at 1064.   Defendant vaguely identifies two purported interests–albeit not in the context of a fundamental right–in support of the Policy: (1) "maintaining accurate state identification documents" to "promote effective law enforcement" and, (2) ensuring "that the information on the license is consistent with other state records describing the individual." (Def.'s Br. 23-24).   Whether the Policy is narrowly tailored to further these interests "will turn on whether it is the least restrictive and least harmful means of satisfying the government's goal . . . ." *United States v. Brandon*, 158 F.3d 947, 960 (6th Cir. 1998).

The Policy bears little, if any, connection to Defendant's purported interests, and even assuming it did, there is no question that requiring an amended birth certificate to change the sex on one's license is far from the least restrictive means of accomplishing the state's goals.   Indeed, as Plaintiffs point out "[b]ecause of the Policy, the sex listed on [their] licences fails to match their appearance and the sex associated with their names." (Plfs.' Resp. 26).   In this way, the Policy undermines Defendant's interest in accurately identifying

---

[4] "Deciding the appropriate standard of review is crucial, because the ultimate decision in a case is often shaped by the standard applied." *United States v. Brandon*, 158 F.3d 947, 956 (6th Cir. 1998); (citing Ashutosh Bhagwat, Hard Cases and the (D)evolution of Constitutional Doctrine, 30 Conn. L.Rev. 961, 964 (1998) (positing that strict scrutiny has been applied so that "essentially no governmental interest sufficed to justify infringement, making strict scrutiny . . . 'fatal in fact,' and that rational basis review has been applied so that 'even the flimsiest governmental justification would suffice.' ")

Plaintiffs to "promote law enforcement."  As the court reasoned in *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*,

> [b]y not allowing transgendered individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity. Thus, when such individuals furnish their license to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the license.

No. 3AN-11-05431 CI, 2012 WL 2685183, *7 (Alaska Super. Ct. Mar. 12, 2012).  Moreover, Defendant's Policy only applies to individuals who are seeking to renew or change an existing license. *See* Applying for a License or ID? Applicant Checklist, *available* at http://michigan.gov/sos/0,4670,7-127-1627_8669_9040_9043-312849--,00.html.  In other words, a first-time transgender applicant may present a "[c]ertified birth certificate . . . [or a] valid, unexpired U.S. passport or passport card" for identity verification purposes.  *Id.*  This is significant, Plaintiffs maintain, because the U.S. Department of State only requires a doctor's certification that an individual has "had appropriate *clinical* treatment for gender transition to the new gender" to change the gender designation on a passport.  *See* (Compl. ¶ 45(a)) (emphasis added); U.S. Dep't of State, Gender Reassignment Applicants, *available at* http://travel.state.gov/content/passports/en/passports/information/gender.html.  Defendant fails to articulate how this two-tiered system promotes the state's purported interest  in ensuring "that the information on the license is consistent with other state records describing the individual . . . ." (Def.'s Br. 24).

Finally, the Court need not spill a considerable amount of ink on the narrow tailoring requirement.  As Plaintiffs point out "[a]t least 25 of the states and the District of Columbia do not require a transgender person to undergo surgery to change the gender on his or her

driver's license or state ID card." (Compl. ¶ 45(c)).  The Court seriously doubts that these states have any less interest in ensuring an accurate record-keeping system.  Moreover, as discussed, the U.S. Department of State, and, according to Plaintiffs, "at least 13 [other] states[,] have implemented policies only requiring a medical provider's certification" in order for an individual to change the gender on their state ID. (*Id.*)  Accordingly, the Court is unable to conclude at this juncture that the Policy narrowly serves the state's interest in maintaining "accurate" identification documents or promoting effective law enforcement.

In light of the Court's finding that Plaintiffs have raised a cognizable privacy claim under § 1983, the longstanding principle of judicial restraint cautions against adjudicating the remaining four constitutional claims.  *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 639 (E.D. Mich. 2015) (declined to address the plaintiffs' equal-protection claim because the case was resolved on due-process grounds).  The remainder of Defendant's motion to dismiss is therefore denied without prejudice. Should future developments require the Court to rule on the viability of Plaintiffs' remaining claims, Defendant may seek leave to renew her motion at that time.

Accordingly, for the reasons thus stated, the Court DENIES Defendant's motion to dismiss [16].


SO ORDERED.

14

s/Nancy G. Edmunds                                   
Nancy G. Edmunds
United States District Judge

Dated:  November 16, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 16, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel                                    
Case Manager